**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-2492
_____

SMITH & WESSON BRANDS, INC.;
SMITH & WESSON SALES COMPANY;
SMITH & WESSON INC.,
Appellants

v.

ATTORNEY GENERAL OF THE STATE OF NEW
JERSEY;
NEW JERSEY DIVISION OF CONSUMER AFFAIRS
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-20-cv-19047)
District Judge: Honorable Julien X. Neals
_____

Argued on November 9, 2021

Before: HARDIMAN, MATEY, and SCIRICA, *Circuit
Judges*

(Filed:  March 10, 2022)

Courtney G. Saleski [Argued]
DLA Piper
1650 Market Street
One Liberty Place, Suite 5000
Philadelphia, PA 19103

Joseph A. Turzi
Edward S. Scheideman
DLA Piper
500 Eighth Street, NW
Washington, DC 20004

Christopher M. Strongosky
DLA Piper
51 John F. Kennedy Parkway
Suite 120
Short Hills, NJ 07078
　　　*Counsel for Appellants*

Andrew J. Bruck
Jeremy M. Feigenbaum
Angela Cai [Argued]
Stephanie J. Cohen
Robert J. McGuire
Michael T. Moran
Tim Sheehan
John T. Passante
Office of Attorney General of New Jersey
25 Market Street
Richard J. Hughes Justice Complex
Trenton, NJ 08625
　　　*Counsel for Appellees*

_____

OPINION OF THE COURT

_____

HARDIMAN, *Circuit Judge.*

Smith & Wesson appeals an order of the District Court dismissing its federal civil rights complaint in view of a subpoena enforcement action pending in the New Jersey state courts. Because the District Court violated its "virtually unflagging obligation . . . to exercise the jurisdiction given," *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976), we will vacate and remand.

I

The New Jersey Attorney General is investigating Smith & Wesson for possible violations of the New Jersey Consumer Fraud Act. *See* N.J. Stat. Ann. § 56:8-2 (prohibiting "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact"). The Act empowers the Attorney General to "investigate consumer-fraud complaints." *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 460 (N.J. 1994) (citing N.J. Stat. Ann. § 56:8-4). It also authorizes him to issue subpoenas, "which shall have the force of law," N.J. Stat. Ann. § 56:8-4, when he believes someone has violated the Act or "when he believes it to be in the public interest that an investigation should be made to ascertain whether a person in fact has engaged in, is engaging in[,] or is about to engage in, any such practice," *id.* § 56:8-3. The Attorney General may request orders from New Jersey courts: "(a) Adjudging [a subpoena

violator] in contempt of court; (b) Granting injunctive relief without notice restraining the sale or advertisement of any merchandise by [a subpoena violator]; or (c) Vacating, annulling, or suspending the corporate charter of a corporation." *Id.* § 56:8-6.

In October 2020, the New Jersey Attorney General issued a subpoena under the Act seeking documents from Smith & Wesson related to the company's advertisements in New Jersey. The subpoena first made a general demand that Smith & Wesson produce copies of and supporting documentation for "all advertisements for [Smith & Wesson's] [m]erchandise that are or were available or accessible in New Jersey [c]oncerning home safety, concealed carry, personal protection, personal defense, personal safety, or home defense benefits of a [f]irearm." App. 25. The subpoena then specifically demanded all documents related to topics of special concern to the Attorney General:

a. Whether Smith & Wesson's [f]irearms can be legally carried and concealed by any [c]onsumer, [i]ncluding by New Jersey [c]onsumers, while in New Jersey;

b. Whether the concealed carry of a [f]irearm enhances one's lifestyle;

c. Whether it is safer to confront a perceived threat by drawing a [f]irearm rather than

4

seeking to move away from and avoid the source of the perceived threat;

d. Whether having a Smith & Wesson [f]irearm or other [f]irearm makes a home safer;

e. Whether Smith & Wesson [f]irearms are designed to be more safe, reliable, accurate, or effective than [f]irearms made by other [f]irearm manufacturers for use in personal or home defense or other activities; and

f. Whether novice, untrained [c]onsumers could successfully and effectively use a Smith & Wesson [f]irearm for personal or home defense.

*Id.* The Attorney General's focus included questions especially concerning Smith & Wesson's comparative claims, such as whether its firearms are "[p]recision built to be the most accurate and reliable." *See Archive: M&P 9 No Thumb Safety*, Smith & Wesson, https://www.smith-wesson.com/firearms/archive-mp-9-no-thumb-safety-0 (last visited Feb. 4, 2022).

Instead of producing the documents when due under the subpoena, Smith & Wesson filed a complaint in the District of New Jersey under 42 U.S.C. § 1983, alleging the subpoena violated the First, Second, Fourth, Fifth, and Fourteenth Amendments. Two months later, in February 2021, the New Jersey Attorney General sought to enforce the subpoena in state court. The state trial court ordered Smith & Wesson to show cause and threatened the company with contempt and a total ban on sales in New Jersey. In response, Smith & Wesson

5

raised many of the same constitutional arguments it presented in its federal suit. The state court summarily rejected those arguments and required Smith & Wesson to produce the subpoenaed documents within 30 days. Smith & Wesson sought an emergency stay of production, but the Appellate Division of the New Jersey Superior Court and the New Jersey Supreme Court denied it.

Meanwhile, in federal court, Smith & Wesson amended its complaint to add claims that the Attorney General's suit was "retaliation for Smith & Wesson's exercise of its First Amendment-protected right to petition [the District] Court for redress." App. 83. The Attorney General then moved to dismiss that complaint, claiming abstention was required under *Younger v. Harris*, 401 U.S. 37 (1971). The District Court agreed and dismissed Smith & Wesson's amended complaint. *Smith & Wesson Brands*, *Inc. v. Grewal*, 2021 WL 3287072, at *3 (D.N.J. Aug. 2, 2021) (holding that abstention under *Younger* was necessary because "the subpoena-enforcement action involves orders in the furtherance of state court judicial function"). Smith & Wesson eventually produced the subpoenaed documents under a protective order, which requires the Attorney General to return the documents if the subpoena is later held unlawful. Smith & Wesson appeals the District Court's order dismissing its amended complaint.

II

The District Court had jurisdiction under 28 U.S.C. § 1331 because Smith & Wesson asserted claims under 42

6

U.S.C. § 1983.[1] We have jurisdiction under 28 U.S.C. § 1291 to review the District Court's order dismissing the case. "We exercise plenary review over a trial court's . . . determination of whether *Younger* abstention is proper." *Hamilton v. Bromley*, 862 F.3d 329, 333 (3d Cir. 2017).

III

"To promote comity between the national and state governments, *Younger* requires federal courts to abstain from deciding cases that would interfere with certain ongoing state proceedings." *Malhan v. Sec'y U.S. Dep't of State*, 938 F.3d 453, 461 (3d Cir. 2019) (citations omitted). *Younger* involved a pending state criminal prosecution, 401 U.S. at 40–41, but the Supreme Court later extended the doctrine to some state civil proceedings, *see Huffman v. Pursue, Ltd.*, 420 U.S. 592, 607 (1975). In the years that followed, federal courts expanded *Younger* and abstained too frequently, so the Supreme Court reined in that expansion. *ACRA Turf Club, LLC v. Zanzuccki*, 748 F.3d 127, 135–36 (3d Cir. 2014); *see Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 81–82 (2013). The Supreme Court has since consistently narrowed abstention doctrines, including *Younger*, because they "conflict[] with federal courts' 'virtually unflagging' obligation to exercise their jurisdiction."

---

[1] The District Court mistakenly treated *Younger* as a jurisdictional constraint. *Smith & Wesson*, 2021 WL 3287072, at *2 (reciting and applying the Rule 12(b)(1) standard). *Younger* is an abstention doctrine that instructs federal courts not to exercise jurisdiction they possess. *See Malhan v. Sec'y U.S. Dep't of State*, 938 F.3d 453, 461 (3d Cir. 2019) (considering whether the District Court should have abstained under *Younger* after concluding that the Court had jurisdiction).

7

*Malhan*, 938 F.3d at 462 (quoting *Sprint*, 571 U.S. at 77); *see also id.* at 458 (citing *Colo. River*, 424 U.S. at 817).

The Court's most recent guidance in *Sprint* explains that "*Younger* extends . . . no further" than three "exceptional circumstances": (1) "state criminal prosecutions"; (2) "civil enforcement proceedings"; and (3) "civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions." 571 U.S. at 78, 82 (cleaned up).[2] The Court clarified that "[a]bstention is not in order simply because a pending state-court proceeding involves the same subject matter." *Id.* at 72. In doing so, "*Sprint* narrowed *Younger*'s domain." *Malhan*, 938 F.3d at 462.

This appeal does not involve a pending state criminal prosecution, so the first *Younger* category is inapplicable. The District Court invoked the third category, holding that the state proceedings involve "orders in the furtherance of state court judicial function." *Smith & Wesson*, 2021 WL 3287072, at *3. In response to Smith & Wesson's arguments in this appeal, the

---

[2] In view of the Supreme Court's holding in *Sprint* that federal courts may not abstain under *Younger* beyond the three "exceptional circumstances," we decline the Attorney General's invitation to create a free-floating doctrine of federalism abstention. *Compare Sprint*, 571 U.S. at 78 ("We have not applied *Younger* outside these three 'exceptional' categories, and today hold . . . that they define *Younger*'s scope."); *with J.B. v. Woodard*, 997 F.3d 714, 722–23 (7th Cir. 2021) (abstaining based on the "risk[] [of] a serious federalism infringement" even though "none of the abstention doctrines— if examined and applied in isolated fashion—apply to [the plaintiff's] claims").

Attorney General argues that abstention is also appropriate under the second *Younger* category because the subpoena enforcement action is a civil enforcement proceeding akin to a criminal prosecution.

## A

We first consider whether the subpoena enforcement action falls within the second *Younger* category—is it a "civil enforcement proceeding"? To qualify as such, the underlying state action must be "akin to a criminal prosecution in important respects." *Sprint*, 571 U.S. at 79 (cleaned up). In other words, "the state civil enforcement proceeding must be 'quasi-criminal' in nature." *ACRA Turf*, 748 F.3d at 138 (quoting *Sprint*, 571 U.S. at 81). Three factors guide this inquiry: "whether (1) the action was commenced by the State in its sovereign capacity, (2) the proceeding was initiated to sanction the federal plaintiff for some wrongful act, and (3) there are other similarities to criminal actions, such as a preliminary investigation that culminated with the filing of formal charges." *Id.* (citing *Sprint*, 571 U.S. at 79–80). Pre-*Sprint* caselaw provides another consideration: "whether the State could have alternatively sought to enforce a parallel criminal statute." *Id.* (gleaning this factor from *Huffman*, 420 U.S. at 604, and *Trainor v. Hernandez*, 431 U.S. 434, 444 (1977)).

There is no dispute about the first factor; New Jersey brought the subpoena enforcement action in its sovereign capacity. And although the Attorney General maintains the third factor—whether there was a preliminary investigation "culminating in the filing of a formal complaint or charges," *Sprint*, 571 U.S. at 80 (citations omitted)—is met, he concedes that his investigation into Smith & Wesson's alleged subpoena

9

violation was limited. That distinguishes this case from those where more robust preliminary investigations led to the filing of administrative complaints. *See, e.g.*, *Ohio Civ. Rts. Comm'n v. Dayton Christian Schs.*, 477 U.S. 619, 624 (1986); *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 433 (1982). Moreover, in those cases, the investigation and the charges concerned the same conduct. *See, e.g.*, *Dayton Christian Schs.*, 477 U.S. at 624 (sex discrimination investigation preceding formal complaint alleging sex discrimination); *Middlesex*, 457 U.S. at 428 (investigation for attorney ethics violation preceding formal charges of ethics violations). Here, however, the substantive investigation concerned consumer fraud, yet the complaint alleged only violation of a subpoena. These distinctions suggest the subpoena enforcement action is not "akin to a criminal prosecution." *Sprint*, 571 U.S. at 79 (quoting *Huffman*, 420 U.S. at 604).

We must consider just one more factor—whether Smith & Wesson has been charged with wrongdoing for which it can be sanctioned—to determine whether the state action is "quasi-criminal." *See ACRA Turf*, 748 F.3d at 138. We agree with Smith & Wesson that the subpoena enforcement action is not a suit initiated to punish wrongdoing.

*Sprint* teaches that a suit is meant to punish wrongdoing where the state court defendant (the federal plaintiff) violated a legal right or duty. 571 U.S. at 79 (listing examples of cases that satisfy this factor, like disciplinary proceedings against lawyers, actions to recover fraudulently obtained welfare payments, and suits to enforce obscenity laws). We have likewise held that a suit was initiated to punish wrongdoing where the State sought unpaid taxes for the misclassification of employees. *PDX N., Inc. v. Comm'r N.J. Dep't of Lab. &*

10

*Workforce Dev.*, 978 F.3d 871, 883–84 (3d Cir. 2020), *cert. denied* 142 S. Ct. 69 (2021). But in the case most like this one, we recently held that a subpoena enforcement action did not punish wrongdoing. *TitleMax of Del., Inc. v. Weissmann*, 24 F.4th 230, 236–37 (3d Cir. 2022).

The subpoena enforcement action here differs in at least two significant respects from suits that punish wrongdoing. First, the Attorney General did not allege that Smith & Wesson violated any substantive legal duty. To date, he has not accused the company of violating the Consumer Fraud Act; he is investigating possible violations. That fact distinguishes the subpoena enforcement action from *PDX*, as well as the examples of civil enforcement actions the Supreme Court listed in *Sprint*. In *PDX*, the employers underpaid taxes after misclassifying their employees. 978 F.3d at 883–84. Likewise, in *Sprint*'s examples of wrongdoing, the state defendants violated substantive legal rights or duties. 571 U.S. at 79. Here, in contrast, Smith & Wesson is alleged to have violated a procedural rule related to the production of documents. Where procedure is at issue, the third *Younger* category—"civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions," *id.* at 78 (cleaned up)—is a more natural fit than the second *Younger* category.

Second, and most importantly, Smith & Wesson did nothing wrong, so the suit cannot be one "initiated to sanction [it] for some wrongful act." *Id*. at 79. Instead of producing the documents on the date specified on the subpoena, it petitioned a federal court to adjudicate its rights and obligations. Federal law authorizes just such a civil action (*i.e.*, one alleging that the Attorney General violated the company's constitutional rights). *See* 42 U.S.C. § 1983. And when the state trial court

11

ordered Smith & Wesson to comply and the state court of appeals provided no relief, the company produced the subpoenaed documents. So Smith & Wesson was never sanctioned; it only had to produce documents. A subpoena enforcement action that requires the production of documents "is not 'retributive in nature' or 'imposed to punish . . . some wrongful act.'" *TitleMax*, 24 F.4th at 237 (quoting *ACRA Turf*, 748 F.3d at 140).

The Attorney General responds that Smith & Wesson committed wrongdoing when it failed to respond to the subpoena by the date specified. The structure of the Consumer Fraud Act supports this reasoning. If an entity violates a subpoena issued by the Attorney General in a consumer fraud investigation, it may be subject to contempt, as well as a complete prohibition on "the sale or advertisement of any merchandise" and suspension of its corporate charter. N.J. Stat. Ann. § 56:8-6. These statutory "[p]enalties are, by their very nature, retributive: a sanction for wrongful conduct." *PDX*, 978 F.3d at 884 (citation omitted).

But those penalties are not self-executing; a court will impose them only after the subpoenaed party violates a court order. *Grewal v. 22Mods4ALL, Inc.*, No. ESX-C-244-19, slip op. at *17 (N.J. Super. Ct. Ch. Div. May 24, 2021) ("[T]he failure to obey [a subpoena issued by the Attorney General may be] addressed by the court to compel compliance but it is not treated as a violation of the [Consumer Fraud Act]."). This case is a perfect example of that reality. Even after the Attorney General filed suit, the state court did not hold Smith & Wesson in contempt for failing to produce the subpoenaed documents. Smith & Wesson would be in contempt only by violating the state court's order, which never happened.

12

Although not mentioned in *Sprint*, we may also consider whether the statute being enforced has a criminal counterpart to help us decide whether an action is quasi-criminal. *ACRA Turf*, 748 F.3d at 138 (citations omitted). The Attorney General asserts that New Jersey's general criminal contempt statute is analogous. *See* N.J. Stat. Ann. § 2C:29-9(a). But even assuming there is a criminal analogue, two of the three guideposts the Supreme Court established in *Sprint*—whether there was an investigation leading to formal charges and whether there was wrongdoing to sanction—are not met here. The presence of a criminal analogue alone—a factor not even mentioned in *Sprint*—does not alter our conclusion. *See TitleMax*, 24 F.4th at 237 (holding that abstention was not warranted where there was a criminal analogue but other factors suggested the state action was not quasi-criminal).

For all these reasons, we hold that the subpoena enforcement action was not quasi-criminal under *Sprint*.

B

We next consider whether the District Court correctly abstained because the subpoena enforcement action "involves orders in the furtherance of state court judicial function." *Smith & Wesson*, 2021 WL 3287072, at *3. A review of the Supreme Court's holdings reveals that the District Court erred.

The Supreme Court has clarified that not all state court orders trigger abstention; they must be "*uniquely* in furtherance of the state courts' ability to perform their judicial functions." *Sprint*, 571 U.S. at 78 (emphasis added) (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans* (*NOPSI*), 491 U.S. 350, 368 (1989)). The two leading cases that involved such

13

orders are *Juidice v. Vail*, 430 U.S. 327 (1977) and *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987).

*Juidice* is closely analogous to this case. The two plaintiffs there—Ward and Rabasco—asked the federal court to enjoin state contempt proceedings as unconstitutional. *Juidice*, 430 U.S. at 328–29, 332. Ward had already been held in contempt. *Id.* at 332. Rabasco had not yet been sanctioned, but contempt was imminent because he had failed to comply with a court order to show cause. *Id.* The Court abstained from adjudicating the dispute because the plaintiffs "had an opportunity to present their federal claims in the state proceedings." *Id.* at 337. The Court wanted to avoid any action that could "readily be interpreted as reflecting negatively upon the state court's ability to enforce constitutional principles." *Id.* at 336 (cleaned up). The Court sought not to infringe upon the State's ability to pursue its interests. *Id.* ("[F]ederal-court interference with the State's contempt process is 'an offense to the State's interest . . . likely to be every bit as great as it would be were this a criminal proceeding.'" (quoting *Huffman*, 420 U.S. at 604)). But the Court also noted the significance of judicial process. The subpoenas in *Juidice* were "court-sanctioned," *id.* at 335, not administrative subpoenas, like the one at issue here. And both plaintiffs had violated court orders. *Id.* at 332.

*Pennzoil* is further afield from this case, so it is less instructive. *Pennzoil* held that federal courts should abstain from deciding the constitutionality of Texas's procedure for transferring property pursuant to a state court judgment. 481 U.S. at 3, 17. The Court provided two justifications: (1) "comity between the States and the National Government;" and (2) "to avoid unwarranted determination of federal constitutional questions." *Id.* at 11. According to the Court,

14

*Juidice* dictated this result because both cases "involve[d] challenges to the processes by which the State compels compliance with the judgments of its courts." *Id.* at 13–14.

The key thread linking *Juidice* and *Pennzoil* is the certainty of the state court's action. In *Juidice*, the plaintiffs had already violated court orders, so they faced imminent imprisonment. 430 U.S. at 332. In *Pennzoil*, the state court merely had to enter judgment on the jury's verdict. 481 U.S. at 6. In both cases, the substantive outcome had occurred; only enforcement remained, and the Supreme Court refused to impede that enforcement.

Here, by contrast, when Smith & Wesson went to federal court there was much more for the state court to do than merely implement a predetermined outcome. New Jersey courts still had to adjudicate Smith & Wesson's constitutional arguments; and even if those arguments were resolved against Smith & Wesson, the state courts still had to give the company an opportunity to produce the required documents before holding it in contempt. Ultimately, Smith & Wesson complied, so the state courts never sanctioned the company. So this appeal differs materially from *Juidice* and *Pennzoil*, where the state courts merely had to enforce orders.

Our recent cases on this subject also weigh against the District Court's decision to abstain. In *TitleMax*, we held that a subpoena enforcement action did not involve orders uniquely in furtherance of the state courts' judicial function. 24 F.4th at 237. There, the state court "ha[d] neither issued orders enforcing the subpoena nor made contempt findings." *Id.* Because the action "present[ed] only a possibility of contempt, akin to any other case," we concluded that abstention was unwarranted. *Id.* Although the state court in this case has issued

15

an order requiring Smith & Wesson to comply with the subpoena, Smith & Wesson has complied, so there is still only "a possibility of contempt." *See id*. And that is insufficient to warrant abstention.

If a *threat* of contempt were all that was required to trigger abstention, we would have to abstain whenever there was a pending civil proceeding since the contempt power is generally available to enforce court orders. *See, e.g.*, N.J. Stat. Ann. § 2A:10-5 ("Any person who shall be adjudged in contempt of the Superior Court by reason of his disobedience to a judgment, order or process of the court, shall [pay a fine]."). But that approach would run afoul of the Supreme Court's insistence that "even in the presence of parallel state proceedings, abstention from the exercise of federal jurisdiction is the 'exception, not the rule.'" *Sprint*, 571 U.S. at 81–82 (quoting *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984)). Once a party has violated a court order, the situation changes. *See Juidice*, 430 U.S. at 332 (noting that both plaintiffs had violated court orders). But as we have noted, Smith & Wesson was never cited for contempt because it complied with the subpoena when ordered to do so by the state courts.

Similarly, in *Malhan* we held that none of the three orders challenged by the federal plaintiff met the Supreme Court's criteria for abstention. 938 F.3d at 462–65. First, we held the means by which the State collected non-final judgments "further[ed] family court enforcement—but not uniquely so." *Id.* at 463. In doing so, we distinguished the State's collection method from "a process, such as civil contempt, that is separate from the merits and that ends when the defendant complies." *Id.* Second, we held that state court orders that required the plaintiff to pay child and spousal

support "d[id] not ensure that family courts can perform their functions—they [we]re merely the output of those functions." *Id.* Finally, we held that a threat to garnish wages did not furnish a basis for abstention because no proceedings were "pending." *Id.* at 463–64 (quoting *Sprint*, 571 U.S. at 78). Those holdings are instructive here. Like the orders in *Malhan*, the document production order and threatened contempt orders in this case are neither collateral to other proceedings nor totally "separate from the merits." *Id.* at 463. Instead, they resemble the "output of [state judicial] functions." *Id.* (citation omitted). Thus, *Malhan*'s first two holdings counsel against abstention in this case.

*Malhan*'s third holding—reciting the rule that abstention is appropriate only if state court proceedings are "pending," *id.* at 463–64 (quoting *Sprint*, 571 U.S. at 78)—is less helpful. Even assuming that the state court proceedings here were pending, abstention would still be inappropriate. The Supreme Court has held that courts should consider whether a state judicial proceeding is ongoing only if it fits within one of the three *Sprint* categories. 571 U.S. at 81; *see PDX*, 978 F.3d at 882–83. Because we have already concluded that this case does not meet *Sprint*'s criteria, we need not consider whether the state proceedings were ongoing.

In sum, we hold that abstention was not warranted in this case because the document production order was not "uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint*, 571 U.S. at 78 (quoting *NOPSI*, 491 U.S. at 368).

17

\*     \*     \*

Federal courts owe due respect to state courts. Yet the Supreme Court has cautioned that abstention is appropriate only in "exceptional" cases. *Id.* at 73 (quoting *NOPSI*, 491 U.S. at 368). This case does not meet the carefully delineated criteria for abstention established in *Sprint*. We will therefore vacate the District Court's order dismissing the case and remand for further proceedings consistent with this opinion.

*Smith & Wesson Brands Inc, et al. v. Attorney General New Jersey, et al.*, No. 21-2492

---

MATEY, *Circuit Judge*, concurring.

I join in holding that the District Court must wrestle with the perplexing facts of this case. I write separately to note that those facts present novel questions at the crossroads between the guarantees in the First and Second Amendments. For more than sixty years, New Jersey's Attorney General enjoyed the powers of the Consumer Fraud Act to protect the public from misleading advertising. New Jersey has also regulated firearms for more than three centuries. *E.g.*, An Act Against Wearing Swords 1686 N.J. Laws at 289–90; § 1, 1797 N.J. Laws at 179; § 2, 1799 N.J. Laws at 562; 2 Compiled Stats. of N.J. 1759 (1911); N.J. Stat. Ann. § 2A:151–41 (1966); *see also* Aaron Leaming & Jacob Spicer, The Grants, Concessions, and Original Constitutions of the Province of New Jersey 289 (1758). Those regulations have, for decades, included firearms-specific advertisement restrictions. N.J. Stat. Ann. § 2C:39-15 (1990).[1]

---

[1] "Any person who offers to sell a machine gun, semi-automatic rifle, or assault firearm by means of an advertisement published in a newspaper circulating within this State, which advertisement does not specify that the purchaser shall hold a valid license to purchase and possess a machine gun or assault firearm, or a valid firearms identification card to purchase and possess an automatic or semi-automatic rifle, is a disorderly person."

Now, for the first time, the State seeks to apply the Consumer Fraud Act to supplement these specific restrictions, waving aside concerns about the protections of the First and Second Amendment rights of New Jersey residents in, as always, the name of "safety." It is a well-traveled road in the Garden State, where long-dormant regulatory powers suddenly spring forth to address circumstances that have not changed. *See Ass'n of New Jersey Rifle & Pistol Clubs Inc. v. Att'y Gen. New Jersey*, 974 F.3d 237, 258 (3d Cir. 2020) (Matey, J., dissenting) (discussing New Jersey's inconsistent restrictions on magazine capacity). Consider where this new highway will take us.[2] Future firearms instructors, fearing the arrival of subpoenas, might decide it is not worth advertising their services for "safety" training. Maybe range operators, sporting clubs, or hunting lodges, recalling some dusty pamphlet mentioning their attention to "safety" will weigh waiting for investigators against early retirement. And almost certainly, every shop-owner stocking firearms for "self-defense" or personal "safety" can begin planning for periodic advertising inspections from the Attorney General. Perhaps publishers will be punished too, with outdoor magazines thinking twice before

---

[2] A journey aided by the capacious language of the Consumer Fraud Act definition of "advertisement" to include "the attempt directly or indirectly by publication, dissemination, solicitation, indorsement or circulation or in any other way to induce directly or indirectly any person to enter or not enter into any obligation or acquire any title or interest in any merchandise or to increase the consumption thereof . . . ." N.J. Stat. Ann. § 56:8-1(a).

2

speaking about the content of a product.[3] One might suspect that is the whole point.[4]

Pointed questions that are all appropriately considered by the District Court on remand. New Jersey is free to experiment with the enforcement of its laws. But the liberties reserved to the states by the Tenth Amendment do not negate

---

[3] The Consumer Fraud Act shields publishers and broadcasters carrying the suspect advertisement only when "the owner, publisher, or operator has no knowledge of the intent, design or purpose of the advertiser." N.J. Stat. Ann. § 56:8-2. Small comfort.

[4] A point illustrated by New Jersey's representation to this Court that Smith & Wesson advertised that "[a] specific firearm product is quote 'the most accurate and reliable.'" Unofficial Transcription of Oral Argument at 19:55 to 22:59, available at http://www2.ca3.uscourts.gov/oralargument/audio/21-2492Smith%26WessonBrandsetalv.Atty GenStateofNJetal.mp3. Smith & Wesson never made that unqualified claim. The selectively quoted advertisement actually reads: "[p]recision built to be the most accurate and reliable firearms, M&P pistols are an experience you have to feel to believe." https://www.smith-wesson.com/firearms/archive-performance-center-mp-9-pro-series-0, [https://perma.cc/V5E5-X88E]. That seems more aspirational than factual, premised on "precision" manufacturing, not broad claims of safety. A far-more precise statement, it seems, than New Jersey's misleading argument. That less-than-forthcoming approach to litigation suggests that careful review of New Jersey's entire investigation is warranted.

the privileges reserved to the people, including "the widely accepted principle at the Founding that the right to self-defense derived directly from the natural right to life, giving the people predictable protections for securing the 'Blessings of Liberty.'" *See Ass'n of New Jersey Rifle & Pistol Clubs Inc.*, 974 F.3d at 258 (Matey, J., dissenting) (citing U.S. Const. pmbl.; see also Declaration of Independence para. 2 (U.S. 1776)).